FILED
2019 Dec-17  PM 01:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

|  |  |
|---|---|
| ALABAMA, LOUISIANA, SOUTH DAKOTA, | |
| Plaintiffs, | **COMPLAINT** |
| v. | Civil Action No. _____ |
| DAVID S. FERRIERO, in his official capacity as Archivist of the United States, Defendant. | |

The sovereign States of Alabama, Louisiana, and South Dakota bring this action against Defendant for declaratory and injunctive relief, and allege as follows:

## INTRODUCTION

1.      In 1972, Congress proposed the Equal Rights Amendment (ERA) as an amendment to the United States Constitution. The ERA would have stated that "[e]quality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex." As is customary for constitutional amendments, Congress gave the States seven years to ratify the ERA.

2.      The ERA fell eight States short of the 38 States needed for ratification (three-fourths of 50). When the congressional deadline expired, only thirty States had ratified the ERA. Fifteen States had not ratified it, and five States had ratified but rescinded their ratifications. Thus, the ERA failed to become part of the Constitution.

3.     Recently, however, activists around the country have argued that the ERA can still be ratified. They have developed a so-called "three-state strategy," which contends that the ERA will become law if only three more States ratify it. The activists have persuaded many to go along with their strategy. Trumpeting their logic, Nevada and Illinois purported to "ratify" the ERA in 2017 and 2018, respectively. And many States are currently working to become the third and final "ratifier." Unless another State moves first, Virginia will enact a bill "ratifying" the ERA in January 2020.

4.     The three-state strategy is deeply misguided. The ERA cannot be ratified because the congressional deadline for ratification has expired. Even without the deadline, the three-state strategy would fall five States short because Nebraska, Idaho, Tennessee, Kentucky, and South Dakota all rescinded their ratifications. Both the original congressional deadline and the state rescissions are valid and enforceable. As Justice Ginsburg recently stated, "the equal rights amendment" cannot be law unless it is "put back in the political hopper and we[] start[] over again collecting the necessary states to ratify it."

5.     Yet the Archivist of the United States—the federal officer who oversees the ratification process, receives States' ratification documents, and makes determinations about the documents' validity—apparently agrees with the three-state strategy. Even though the deadline for ratifying the ERA has expired, the Archivist maintains possession of the States' ratification documents and continues to receive new ratification documents (including from Nevada and Illinois). The Archivist also refuses

to recognize the States' rescissions of their prior ratifications, maintaining possession of their ratification documents and falsely listing them as having ratified the ERA.

6.     The Archivist is acting illegally. His actions violate the bedrock rules that the Constitution and Congress have established for ratifying constitutional amendments. As a result, Plaintiffs bring this action for declaratory and injunctive relief.

## PARTIES

7.     Defendant, David S. Ferriero, is the Archivist of the United States. The Archivist directs and supervises the National Archives and Records Administration and is responsible for administrating the process of ratifying constitutional amendments. *See* 1 U.S.C. §106b. The Archivist is sued in his official capacity.

8.     Plaintiffs Alabama and Louisiana have never ratified the ERA. If the ERA is ratified, it would expose Alabama and Louisiana to costly litigation and threaten to invalidate several of their duly enacted laws.

9.     Plaintiff South Dakota ratified the ERA in 1973, but rescinded its ratification in 1979. South Dakota rescinded its ratification because it concluded that the ERA was a costly, unwise addition to the Constitution. Despite South Dakota's rescission, the Archivist has not returned its ratification documents and maintains records that falsely indicate South Dakota has ratified the ERA. If South Dakota's rescission is not honored and the ERA is ratified, it would expose South Dakota to costly litigation and threaten to invalidate several of its duly enacted laws.

## JURISDICTION & VENUE

10.     This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because this case arises under the Constitution and laws of the United States.

11.     Venue is proper under 28 U.S.C. §1391(e) because Defendant is an officer of the United States sued in his official capacity, this case does not involve real property, and Plaintiff Alabama "resides" in the Northern District of Alabama.

## FACTS

### I.     The Constitutional Amendment Process

12.     Article V of the Constitution establishes the process for proposing and ratifying amendments. Absent a convention, Article V requires amendments to be proposed by a supermajority of Congress and ratified by a supermajority of States:

> The Congress, whenever two thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, or, on the application of the legislatures of two thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the several states, or by conventions in three fourths thereof, as the one or the other mode of ratification may be proposed by the Congress ….

13.     Article V gives both Congress and the States important and distinct roles in the amendment process. *See* The Federalist No. 43 (Hamilton) (explaining that Article V "equally enables the general and the State governments"). This balance was by design, as it makes the amendment process "neither wholly national nor wholly federal." The Federalist No. 39 (Madison). Article V accomplishes this balance by giving Congress

and the States "carefully balanced and approximately equally distributed" powers. *Idaho v. Freeman*, 529 F. Supp. 1107, 1128 (D. Idaho 1981).

14.     Congress has the power to control the "mode of ratification." U.S. Const., Art. V; *see United States v. Sprague*, 282 U.S. 716, 732 (1931) ("This Court has repeatedly and consistently declared that the choice of mode rests solely in the discretion of Congress."). This power includes not only the authority to choose the method of ratification (state legislatures versus state conventions), but also the authority to control other "matter[s] of detail" regarding how the States ratify amendments. *Dillon v. Gloss*, 256 U.S. 368, 376 (1921).

15.     One of those "matter[s] of detail" is the "period for ratification." *Id.* As the Supreme Court explained in *Dillon*, there is "no doubt" that Congress has the power to set enforceable time limits on the period for ratifying a constitutional amendment. *Id.* Indeed, Congress has repeatedly exercised that power, putting time limits in both the text of proposed amendments (e.g., the Eighteenth, Twentieth, Twenty-First, and Twenty-Second Amendments) and in the proposing resolutions (e.g., the Twenty-Third, Twenty-Fourth, Twenty-Fifth, and Twenty-Sixth Amendments).

16.     As for the States, they have the power to determine "when" they have "ratified" an amendment. U.S. Const., Art. V; *see Freeman*, 529 F. Supp. at 1134 (Article V gives the States "exclusive control over the actual process of ratification, or determination of actual consensus."); *Dyer v. Blair*, 390 F. Supp. 1291, 1307 (N.D. Ill. 1975) (Stevens, J.) ("[Article V's] failure to prescribe any particular ratification

procedure, or required vote to effectuate a ratification, is certainly consistent with the basic understanding that state legislatures should have the power and the discretion to determine for themselves how they should discharge the responsibilities committed to them by the federal government."). This, too, was by design. In response to the Anti-Federalists' fears about Congress's role in the amendment process, the Federalists pointed to the States' exclusive power over ratification. Given this power, they explained, "[w]e may safely rely on the disposition of the State legislatures to erect barriers against the encroachments of the national authority." The Federalist No. 85 (Hamilton).

17.    The States' power to control ratification includes the power to *rescind* a prior ratification. "[T]he drafters of the Constitution considered it important" that constitutional amendments "draw on that same power which is the source of the original authority of the Constitution—'the consent of the people.'" *Freeman*, 529 F. Supp. at 1148. That consent is missing when a State timely rescinds its ratification. "To allow a situation where … the first act of a state is irrevocable … would permit an amendment to be ratified by a technicality … and not because there is really a considered consensus supporting the amendment." *Id.* at 1149.

18.    In addition to Congress and the States, the Archivist plays a role in the ratification process. The Archivist follows procedures and customs established by his predecessors—the General Services Administrator, and before that the Secretary of State.

19.     When a State ratifies a constitutional amendment, it sends its ratification documents to the Archivist. Acting through his Office of the Federal Register, the Archivist reviews the documents and decides whether they are legally sufficient. If he decides that they are, the Archivist records the State's ratification and maintains possession of the documents.

20.     When three-fourths of the States ratify an amendment, the Archivist must "cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States." 1 U.S.C. §106b. The Archivist's certification is published in the Federal Register and the U.S. Statutes at Large, and it marks the end of the amendment process. Before issuing this certification, however, the Archivist determines whether the amendment "has been adopted[] according to the provisions of the Constitution." *Id.*

21.     While some aspects of the Archivist's duties are purely ministerial, his initial review and final determination of the legality of state ratifications are not.

## II.     The Proposal and Rejection of the ERA

22.     On March 22, 1972, Congress enacted a joint resolution proposing the ERA and submitting it to the States for ratification. The joint resolution, which was enacted by two-thirds of the House and Senate, required the States to ratify the ERA "within seven years." In other words, the joint resolution imposed a ratification deadline of March 22, 1979:

JOINT RESOLUTION

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

[H. J. Res. 208]

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein),* That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE —

"SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"SEC. 3. This amendment shall take effect two years after the date of ratification."

23.    In 1978, Congress passed a joint resolution purporting to extend the ERA's ratification deadline to June 30, 1982. Unlike the original deadline, the extension passed with only simple majorities of the House and Senate. The only court to consider its constitutionality held that the extended deadline exceeded Congress's authority under Article V. *See Freeman*, 529 F. Supp. at 1150-53.

24.    The ERA was not ratified by the requisite number of States (38) within the original deadline of 1979 or the extended deadline of 1982.

25.    Thirty States ratified the ERA within the original deadline: Alaska, California, Colorado, Connecticut, Delaware, Hawaii, Indiana, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, Texas, Vermont, Washington, West Virginia, Wisconsin, and Wyoming.

26. Four States ratified the ERA, but then rescinded their ratifications before the original deadline. Nebraska rescinded in 1973, less than one year after its ratification. Tennessee rescinded in 1974, a year after its ratification. Idaho rescinded in 1977, less than five years after its ratification. And the Kentucky Legislature rescinded in 1978, less than six years after its ratification.

27. One State, South Dakota, ratified the ERA within the original deadline; but after Congress purported to extend that deadline, South Dakota passed a resolution rescinding its ratification. The resolution provided that, if three-fourths of the States did not ratify the ERA by the *original* deadline, then South Dakota "withdraws its ratification" and "renders [it] null and void and without any force or effect whatsoever."

28. No additional States ratified the ERA between the original deadline of 1979 and the extended deadline of 1982.

29. Still today, thirteen States have never purported to ratify the ERA: Alabama, Arizona, Arkansas, Florida, Georgia, Louisiana, Mississippi, Missouri, North Carolina, Oklahoma, South Carolina, Utah, and Virginia.

30. Despite the failure of the ERA, the Supreme Court has interpreted other provisions of the Constitution to accomplish most of the ERA's original goals. For example, the Supreme Court has held that the Equal Protection Clause largely prohibits laws that discriminate on the basis of sex. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 532 (1996). And the Supreme Court has held that the Due Process Clause secures the right to an abortion. *See Roe v. Wade*, 410 U.S. 113 (1973).

31.     The Supreme Court's approach to these issues, however, has been cautious and limited. The Court subjects sex-based laws to only intermediate scrutiny, not strict scrutiny. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988). The Court likewise subjects abortion regulations to the "undue burden" standard, another form of intermediate scrutiny. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016). And the Court has held that governments have no obligation to fund abortions. *See Harris v. McRae*, 448 U.S. 297 (1980).

32.     Given these developments, the only reason to ratify the ERA today would be to push the law further—to increase the level of scrutiny for sex-based laws, to remove the limitations in the Court's jurisprudence, and to expand the frontiers of what qualifies as discrimination "on account of sex." That is precisely what would happen if the ERA were ratified in the current legal and political climate.

33.     For example, if the ERA were ratified today, activists would urge courts to use the amendment to overturn legitimate regulations of abortion and to mandate state funding of abortions. New Mexico, for example, has interpreted its ERA to provide a broader right to abortion than U.S. Supreme Court precedent. *See N.M. Right to Choose/NARAL v. Johnson*, 975 P.2d 841 (N.M. 1998). And courts in New Mexico, Connecticut, and Massachusetts have interpreted their ERAs to require taxpayer funding of abortions. *See id.*; *Doe v. Maher*, 515 A.2d 134 (Conn. Super. Ct. 1986); *Moe v. Sec'y of Admin. & Fin.*, 417 N.E.2d 387, 405 (Mass. 1981). Many ERA proponents welcome these developments and intend to use the ERA to achieve them; when efforts

were made in Congress to make the ERA abortion neutral, for example, proponents of the ERA worked hard to defeat them. They were successful.

34.    As another example, litigants would urge courts to use the ERA to invalidate policies that reflect a biological definition of "sex." While that definition was the predominant one when the ERA was proposed in the 1970s, several courts have recently defined "sex" more broadly to include sexual orientation and gender identity. *See, e.g., Hivley v. Ivy Tech Cmty. College*, 853 F.3d 339 (7th Cir. 2017); *EEOC v. R.G. & G. R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018).

35.    The States that ratified the ERA within the original deadline did not consent to any of this. In the 1970s, the original public meaning of "sex" was far narrower, and ERA proponents actively denied that the amendment would change the law on these topics.

## III.    The Recent, Flawed Efforts to Revive the ERA

36.    In recent years, activists have devised a plan to revive the ERA. Dubbed the "three-state strategy," these activists do not want Congress to reenact the ERA and submit it to the States for a new round of ratifications; instead, they argue that the *original* ERA can become law if only three more States ratify it. Three more States, the logic goes, would bring the total number of ratifying States to 38 (ignoring the rescissions in Nebraska, Idaho, Tennessee, Kentucky, and South Dakota)—supposedly crossing the three-fourths threshold specified in Article V.

37.    Proponents of the three-state strategy are on the precipice of success.

38.     The three-state strategy became a two-state strategy in 2017, when Nevada purported to ratify the ERA.

39.     The two-state strategy became a one-state strategy in May 2018, when Illinois purported to ratify the ERA.

40.     Activists will inevitably find the third and final State. Bills to ratify the ERA have been introduced in Arizona, Georgia, Missouri, North Carolina, South Carolina, and Utah, for example.

41.     But Virginia will almost certainly be the next State to "ratify" the ERA. In early 2019, the Virginia Senate passed a bill to ratify it, but the bill failed in the House of Delegates by one vote. All Democrats voted yes, and the only no votes came from Republicans. After Virginia's November 2019 elections (where the ERA was a major campaign issue), Democrats gained majorities of the House of Delegates and the Senate. Passing the ERA will be a "top priority," according to Virginia's Democratic Governor, when the new legislature convenes on January 8, 2020. "Virginia will be next in line to pass the E.R.A.," he added. In fact, a bill to ratify the ERA has already been prefiled so that the legislature can take it up right away. "[W]e do have the votes to pass it," the soon-to-be Speaker of the House of Delegates declared; and it will be passed "right away," the Senate Democratic Leader echoed. Both Republican and Democratic legislators in Virginia have stated that passage of the ERA is "likely," will occur "within the first seven days of session," and will require only "the work of two afternoons." And pundits predict that passage will be "easy," will occur "rapid[ly]," and will be the

"head of the list." The bill requires only a majority vote (the Governor's signature is not required).

42.     Despite the activists' efforts, the three-state strategy is legally unsound. It relies on at least three key assumptions, all of which are false.

43.     **First**, the three-state strategy assumes that the ERA's ratification deadline, which was imposed by Congress, is invalid. If the time to ratify the ERA expired in 1979 (or 1982), then the ERA is a dead letter and can no longer be ratified by any State. The ERA cannot become law unless two-thirds of Congress reenacts it and three-fourths of the States re-ratify it.

44.     Yet Congress plainly has the power to impose enforceable time limits on ratification. *Supra* ¶15. Because Congress is a separate actor in the ratification process and has independent authority to specify the mode of ratification, it makes no difference *where* the time limit appears—in the text of the proposed amendment or in the text of the proposing resolution.

45.     In fact, the Supreme Court has already held that the ERA's deadline is enforceable and that its expiration makes the amendment a dead letter. After the district court issued its decision in *Freeman*, the Supreme Court agreed to review its decision. Before the Court could do so, however, the extended deadline for ratifying the ERA passed. In a brief filed with the Supreme Court, the U.S. Department of Justice asked the Court to vacate the district court's decision because the case had become moot. *See* Memo. for GSA Suggesting Mootness, *NOW, Inc. v. Idaho*, Nos. 81-1312, 81-1313

(citing, inter alia, *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39-41 (1950)). The case was moot, according to the Government, because "[o]n June 30, 1982, the extended period for ratifying the Amendment expired," "Congress has not passed any additional extension," and the ERA has thus "failed of adoption." *Id.* The Supreme Court agreed. "Upon consideration of the [Government's brief] suggesting mootness … and the responses thereto," the Supreme Court vacated the district court's decision "with instructions to dismiss the complaints as moot." 459 U.S. at 809 (citing *Munsingwear*, 340 U.S. 36).

46.     **Second**, the three-state strategy assumes that the rescissions by Nebraska, Idaho, Tennessee, Kentucky, and South Dakota are invalid. If any one of these rescissions negates that State's earlier ratification, then the three-state strategy will fall short of the 38 States needed to ratify the ERA. Proponents of the ERA would need no less than a six-, seven-, or eight-state strategy instead.

47.     But those rescissions are valid. *Supra* ¶ 17.

48.     **Third**, some adherents of the three-state strategy contend that, even if the deadline for ratifying the ERA has expired and the States' rescissions are valid, there is nothing courts can do about it. They contend that these issues are "political questions" that only Congress can resolve.

49.     Yet the notion of "giving plenary power to Congress to control the amendment process runs completely counter to the intentions of the founding fathers." *Freeman*, 529 F. Supp. at 1126. Because Article V "split[s]" the amending power

"between Congress and the states," "it is evident … that the framers did not intend either of those two parties to be the final arbiter of the process"; rather, "the courts, as a neutral third party … [would] decide … questions raised under article V." *Id.* at 1135. Courts are "not … free" to dismiss challenges to the ratification process as political questions, as then-Judge Stevens explained, because "the [Supreme] Court has on several occasions decided questions arising under article V, even in the face of 'political question' contentions." *Dyer*, 390 F. Supp. at 1300; *accord Freeman*, 529 F. Supp. at 1122-23 (collecting cases).

50.     Despite these obvious flaws with the three-state strategy, the Archivist has endorsed its logic and is actively facilitating it.

51.     Even though the time for ratifying the ERA has expired, the Archivist maintains possession of state ratification documents and has accepted new ratification documents from Nevada and Illinois.

52.     The Archivist has also refused to recognize the validity of the rescissions by Nebraska, Idaho, Tennessee, Kentucky, and South Dakota. The Archivist has maintained possession of these States' ratification documents, and he maintains records that falsely suggest these States have ratified the ERA.

## IV.   An Unconstitutionally Ratified ERA Would Seriously Injure Alabama, Louisiana, and South Dakota

53.   Plaintiffs are committed to equality. That commitment is memorialized in existing law, and it has led to many improvements for Alabama, Louisiana, and South Dakota women.

54.   If the ERA were ratified today through the activists' unlawful scheme, it would not promote true equality. Instead, it would undermine the rule of law and threaten the progress Alabama, Louisiana, and South Dakota women have made.

55.   Plaintiffs "ha[ve] an interest in securing observance of the terms under which it participates in the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607-08 (1982). If Plaintiffs are subjected to the ERA based on late ratifications, they will be "denied [their] rightful status within the federal system." *Id.* at 607.

56.   If the ERA is added to the federal Constitution, it will govern Plaintiffs. Being governed by an unconstitutionally ratified amendment would injure Plaintiffs in the same way that being governed by an unconstitutionally structured federal agency injures private parties. *See Buckley v. Valeo*, 424 U.S. 1, 117 (1976) (per curiam) ("Party litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights.").

57.     Moreover, in light of developments since 1972, it is now clear that some judges would apply the ERA to enjoin enforcement of several of Plaintiffs' laws and practices. Such injunctions would not only injure Plaintiffs as sovereigns but also prevent Plaintiffs from enforcing laws that benefit their citizens, especially women.

58.     Plaintiffs have enacted reasonable licensing regulations to protect women's health, *see, e.g.*, Ala. Admin. Code r. 420-5-1-.01; La. Stat. Ann. §§40:2175.3, .4; S.D. Codified Laws 34-23A-5, that are presently constitutional, but would be subject to new legal challenges under the ERA. It is overwhelmingly likely that at least one plaintiff would be able to convince a judge to enjoin enforcement of at least one of Plaintiffs' regulations based on the ERA.

59.     Women in Plaintiff States benefit from the continued enforcement of regulations that protect their health and safety, and Plaintiffs thus have an interest in maintaining that enforcement.

60.     Plaintiffs have enacted reasonable abortion regulations, *see, e.g.*, Ala. Code §26-23A-4; La. Stat. Ann. §§40:1061.9-10, 16-17; La. Admin. Code tit. 48, §4405; S. D. Codified Laws §§34-23A-3-5, 7, that are presently constitutional, but would be subject to new legal challenges under the ERA. It is overwhelmingly likely that at least one plaintiff would be able to convince a judge to enjoin enforcement of at least one of Plaintiffs' regulations based on the ERA.

61.     Plaintiffs have enacted statutes prohibiting public funding of abortions. *See, e.g.*, Ala. Admin. Code r. 560-X-6-.09; Ala. Medicaid-Provider Billing Manual §§5.8,

28.6.7 (Oct. 2019) (forbidding payment for any abortion except those where the life of the mother is in danger or the pregnancy resulted from rape or incest); La. Stat. Ann. §§22:1014 (disallowing health care plans established through an exchange under federal health care reform to offer coverage for abortion services), 40:1061.6 (precluding any public funds from being "used in any way for, to assist in, or to provide facilities for an abortion" except when medically necessary to prevent the death of the mother or the pregnancy resulted from rape or incest); S.D. Codified Laws §§28-6-4.5 (Prohibiting public funds from being used in connection with any abortion except to preserve the life of the mother), 58-17-147 ("No qualified health plan offered through a health exchange established in the state may include elective abortion coverage.").

62.     It is overwhelmingly likely that at least one plaintiff would be able to convince a judge to enjoin enforcement of at least one of Plaintiffs' funding restrictions based on the ERA. *See, e.g.*, *N.M. Right to Choose/NARAL*, 975 P.2d at 850-51 (holding New Mexico's failure to fund abortions through Medicaid violated the state constitution's ERA).

63.     Plaintiffs maintain reasonable policies distinguishing between men and women to maintain the physical safety of women. For example, Plaintiffs help fund women's shelters that do not admit men. This funding helps provide protection and comfort for vulnerable women, many of whom are victims of domestic violence or sexual assault. The ERA would threaten such facilities because of their single-sex admission policies.

64.     Plaintiffs operate prisons that allow for separation and classification of inmates based on an inmate's sex. These policies provide protections for female inmates.

65.     It is overwhelmingly likely that at least one plaintiff would be able to convince a judge that separation of the sexes fails strict scrutiny under the ERA. *See Johnson v. California*, 543 U.S. 499, 507 (2005) ("The need for strict scrutiny is no less important here, where prison officials cite racial violence as the reason for their policy."); *Lee v. Washington*, 390 U.S. 333, 333 (1968) (prohibiting racial segregation in prisons).

66.     Plaintiffs also maintain reasonable policies distinguishing between men and women to promote the interests of women. For example, public schools, including universities, maintain separate sports teams and competitions for men and women. If Plaintiffs' schools are forced to eliminate single-sex sports in favor of coed sports, athletic opportunities for women will diminish. Women in Plaintiff States benefit from the athletic opportunities and scholarship money they receive as a result of single-sex sports.

67.     It is overwhelmingly likely that at least one plaintiff would be able to convince a judge that refusing to allow men to compete in women's athletic competitions violates the ERA. *See Attorney Gen. v. Massachusetts Interscholastic Athletic Ass'n, Inc.*, 393 N.E.2d 284, 296 (Mass. 1979) (holding that state rule that "would bar boys from playing on girls' interscholastic teams" violated state ERA).

68.     The purported ratification of the ERA would subject Plaintiffs to costly litigation on these topics and many others. Numerous statutes and practices—even those previously held lawful under the Equal Protection Clause and non-discrimination statutes—would be subject to reexamination in federal court. Plaintiffs would face not only their own litigation expenses but also potential liability for attorney's fees. *See* 42 U.S.C. §1988(b).

69.     It is overwhelmingly likely that at least one plaintiff would be able to convince a judge to enjoin enforcement of at least one of Plaintiffs' statutes or practices based on the ERA.

70.     Plaintiffs "clearly ha[ve] a legitimate interest in the continued enforceability of [their] own statutes." *Maine v. Taylor*, 477 U.S. 131, 137 (1986) (finding a state had standing to appeal). An injunction preventing Plaintiffs from enforcing one of those laws would cause not only a cognizable injury but an "irreparable" one by undermining "the public interest in the enforcement of [state] laws." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (quotation omitted).

71.     Moreover, "the threat of enforcement of [an unconstitutional law] amounts to an Article III injury in fact." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014).

72.     Steadfast in their support of equality, Plaintiffs oppose the unlawfully late and numerically insufficient ratification of the ERA. They do so to protect the progress women in each Plaintiff State have made, to vindicate the States' sovereign interests, and to preserve the rule of law.

73.     Thus, Plaintiffs ask this Court to prevent the unconstitutional certification and publication of the ERA. *See* 1 U.S.C. §106b.

## COUNT I
## The ERA Has Expired
### (Violation of H.J. Res. 208 and Article V of the Constitution)

74.     Plaintiffs repeat and reallege each of the prior allegations in this complaint.

75.     Congress can limit the amount of time that States have to ratify a constitutional amendment. When such a time limit expires—whether it appears in the constitutional text or the proposing resolution—an amendment can no longer be ratified. If a State purports to ratify an amendment after the deadline expires, its ratification is null and void and without any legal effect.

76.     When Congress proposed the ERA in 1972, it included a seven-year ratification deadline. That deadline expired in 1979, before the ERA was ratified by the requisite 38 States. Congress has no power to extend that deadline, and Congress has not extended that deadline beyond 1982. Thus, the ERA can no longer be ratified.

77.     Despite the expiration of the ERA, the Archivist maintains possession of the States' ratification documents and continues to accept new ratification documents, including from Nevada in 2017 and Illinois in 2018.

78.     The Archivist's actions are illegal and unconstitutional. They violate the seven-year congressional deadline imposed by H.J. Res. 208 and usurp the authority that Article V vests in Congress and the States.

## COUNT II
## The Rescissions Are Valid
### (Violation of Article V of the Constitution)

79.     Plaintiffs repeat and reallege each of the prior allegations in this complaint.

80.     A State can rescind its ratification of a constitutional amendment, if it does so before the amendment is approved by three-fourths of the States. That rescission renders the State's prior ratification null and void.

81.     Five States—Nebraska, Idaho, Tennessee, Kentucky, and South Dakota—have rescinded their prior ratifications of the ERA. And they did so before the congressional deadline expired. Thus, these States have not ratified the ERA.

82.     Yet the Archivist refuses to honor the States' rescissions. He maintains possession of their ratification documents. He maintains records that falsely indicate that these States ratified the ERA. And he counts these States as having ratified the ERA.

83.     The Archivist's actions are unconstitutional. They usurp the authority that Article V vests in the States.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendant and provide the following relief:

i.    A declaratory judgment that the ERA cannot be ratified because the congressional deadline has expired and that all ratifications after the 1979 deadline (including the ratifications of Illinois and Nevada) are null and void;

ii.   A declaratory judgment that Nebraska, Idaho, Tennessee, Kentucky, and South Dakota validly rescinded their prior ratifications of the ERA and cannot be counted as having ratified the ERA;

iii.  A permanent injunction requiring Defendant to return South Dakota's ratification documents;

iv.   A permanent injunction requiring Defendant to remove South Dakota's name from all official records suggesting that it ratified the ERA;

v.    A permanent injunction prohibiting Defendant from accepting or acknowledging any additional ratifications of the ERA;

vi.   A preliminary injunction granting the above relief during the pendency of this action;

vii.  Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees; and

viii. All other further relief to which Plaintiffs might be entitled.

Dated: December 16, 2019

STEVE MARSHALL
*Attorney General of Alabama*

 /s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Solicitor General*
James W. Davis
*Deputy Attorney General*
A. Barrett Bowdre
*Deputy Solicitor General*
Kelsey J. Curtis
*Assistant Solicitor General*
OFFICE OF THE ALABAMA ATTORNEY
GENERAL
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
(334) 353-2196
(334) 353-8400 (fax)
edmund.lacour@AlabamaAG.gov
jim.davis@AlabamaAG.gov
barrett.bowdre@AlabamaAG.gov
kelsey.curtis@AlabamaAG.gov

JEFF LANDRY
*Attorney General of Louisiana*

 /s/ Elizabeth B. Murrill
Elizabeth B. Murrill (pro hac vice
forthcoming)
*Solicitor General of Louisiana*
LOUISIANA DEPARTMENT OF
JUSTICE
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 326-6766
MurrillE@ag.louisiana.gov

Respectfully submitted,

 /s/ Patrick Strawbridge
Patrick Strawbridge
CONSOVOY MCCARTHY PLLC (pro
hac vice forthcoming)
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

Cameron T. Norris (pro hac vice
forthcoming)
Alexa R. Baltes
Tiffany H. Bates
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
lexi@consovoymccarthy.com
tiffany@consovoymccarthy.com

JASON RAVNSBORG
*Attorney General of South Dakota*

 /s/ Paul S. Swedlund
Paul S. Swedlund (pro hac vice
forthcoming)
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
STATE OF SOUTH DAKOTA
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
605-773-3215
paul.swedlund@state.sd.us